UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>AMBAWALAGE S. SILVA,<br><br>    Defendant. | Case No. 15-14407<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER**
**GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [22] AND**
**DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [11]**

In this civil tax case, the government seeks to reduce to judgment the assessments made against Defendant Ambawalage Silva for the three years he failed to file tax returns. The parties have filed cross-motions for summary judgment. The primary issue disputed is whether the IRS mailed Silva a "Notice of Deficiency" for the relevant years before prosecuting the assessments, as required under 26 U.S.C. §§ 6212(a) and 6213(a).

After careful consideration of the briefs and thorough review of the record, the Court finds that oral argument will not aid in resolving the pending motion. *See* E.D. Mich. LR 7.1(f)(2). Silva has failed to raise any genuine issue of material fact about whether the government mailed the deficiency notices or about his overall tax liability. Accordingly, the Court will grant the government's motion and deny Silva's.

**I.**

Defendant Ambawalage Silva did not file federal income tax returns for tax years 2001, 2002, and 2004. (R. 22-1, PID 215.) The IRS made income tax assessments against Silva for those years. The following table, based on the applicable "Certificates of Assessments,

Payments, and Other Specified Matters" (IRS Form 4340), summarizes the balances of those assessments as of December 21, 2015, when the government filed its complaint in this case:

| Tax Year | Assessment Date | Balance |
|---|---|---|
| 2001 | 9/20/2004 | $25,405.74 |
| 2002 | 12/25/2006 | $105,365.43 |
| 2004 | 12/25/2006 | $30,578.25 |

(R. 22-2 (2002 Form 4340); R. 22-3 (2004 Form 4340); R. 22-4 (2001 Form 4340).) The government also seeks statutory additions of $20,369.35 for 2001, $48,224.11 for 2002, and $13,688.85 for 2004 for the period before its complaint and unspecified amounts thereafter. (R. 1, PID 3.)

The parties dispute whether the government mailed Silva a "Notice of Deficiency" before attempting to collect on the assessments. At the very least, the existence of the notices' is undisputed, as the record includes a notice covering each relevant year—the notice covering the 2001 tax year is dated April 21, 2004 (R. 11, PID 73), and the single notice covering the 2002 and 2004 tax years is dated July 17, 2006 (R. 11, PID 92). But in various correspondences with the IRS over the years, Silva took the position that he either did not remember receiving the notices or in fact did not receive them. For instance, in an August 2006 letter to the IRS, Silva wrote this about the 2001 deficiency notice: "I don't even recall ever receiving any notification[.]" (R. 11, PID 76.) In an October 2006 letter, he wrote, "you have not provided any information to me that proves that such a notice was even sent at all." (R. 11, PID 81.) For the 2002 and 2004 tax years, he wrote in a November 2011 letter, "I did not receive any Notices of Deficiency for the tax years 2002 or 2004." (R. 11, PID 95.) He reiterated that in a December 2011 letter. (R. 11, PID 98.)

2

In 2011, Silva initiated a "collection due process hearing" with the IRS and later petitioned the United States Tax Court to review that proceeding. ("A CDP hearing is a specific administrative procedure, set out in I.R.C. § 6330, through which taxpayers may challenge proposed collection actions brought by the IRS." *Golden v. C.I.R.*, 548 F.3d 487, 492 (6th Cir. 2008).) In the Tax Court proceeding, Silva raised several claims to challenge the collection process. *See Silva v. Comm'r of Internal Revenue*, 2015 WL 7734277, 110 T.C.M. (CCH) 501 (T.C. 2015). Among other things, Silva asserted that he never received the deficiency notice for 2002 and 2004 (the Tax Court had previously determined that it would not hear his claims for 2001 because it found jurisdiction lacking as to that year, *see id.* at *3). As the Tax Court noted:

> Petitioner asserted to the [IRS Settlement Officer] that he had not received the notice of deficiency for 2002 and 2004 and asked that she provide him with documentation relating to the notice and proof he received it. The SO thereafter confirmed that the administrative file included a notice of deficiency for 2002 and 2004 dated July 17, 2006; confirmed that it was addressed to petitioner at his last known address; sent him a copy of the notice; and verified that the tax for 2002 and 2004 was properly assessed after petitioner failed to petition this Court. Petitioner contends that these steps were insufficient to constitute compliance with the verification requirement.

*Id.* at *5. The Tax Court ultimately did not reach the merits of the issue because Silva had mentioned it for the first time in his answering brief—after already filing a stipulation of facts and submitting the case for a decision without trial under Tax Court rules. *Id.* at *6.

In a November 30, 2015 opinion, the Tax Court affirmed the IRS's proposed collection action, finding no merit to Silva's other procedural claims (which are not at issue here). *Id.* at *4, 7. In so doing, the Tax Court sternly disapproved of Silva's conduct throughout the proceedings:

> [O]ur review of the record convinces us that petitioner has exploited the collection review procedures for the principal purpose of delaying collection of his Federal tax liabilities. He refused to participate in the CDP hearing that the IRS offered him and provided the SO with no evidence of any sort. He appears to have intentionally filed imperfect petitions, in the form of letters dated December 15, 2006, and March 29, 2012, in order to lay the predicate for a subsequent motion to

3

> enjoin IRS collection activity as violative of an ongoing Tax Court proceeding. And his briefing tactics reveal a deliberate effort to sandbag respondent. Construing petitioner's claims so liberally as to include a challenge to the timeliness of the notice of deficiency would reward these tactics and would not accomplish substantial justice.

*Id.* at *6 n. 5.

After the Tax Court's ruling, the government filed this action to reduce the assessments to judgment. (R. 1.) On May 11, 2016, well before the discovery cut-off, Silva filed a motion for summary judgment, asserting that he is entitled to judgment as a matter of law because the government has no proof that it properly mailed the deficiency notices for 2001, 2002, and 2004. (R. 11.) On November 4, 2016, the government filed its own motion for summary judgment. (R. 22.) Both motions are fully briefed.

## II.

As each party has moved for summary judgment, the standards are two-fold. To the extent a party seeks summary judgment on a claim or defense for which it does not bear the burden of persuasion at trial, the moving party may discharge its initial summary-judgment burden by "pointing out to the district court . . . that there is an absence of evidence to support [the non-moving party's] case." *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party does so, the non-moving party "must come forward with specific facts showing that there is a genuine issue for trial." *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court must then determine whether the evidence presents a sufficient factual disagreement to require submission of the non-moving party's claims to a factfinder, or whether the evidence is so one-sided that the moving party must prevail as a matter of law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). In making this determination, the

4

Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587.

To the extent a party seeks summary judgment on a claim or defense for which it has the burden of persuasion, the moving party's "initial summary judgment burden is higher in that it must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Surles v. Andison*, 678 F.3d 452, 455–56 (6th Cir. 2012) (internal quotation marks and citations omitted). In making this determination, the Court views the evidence, and any reasonable inferences drawn from the evidence, in the light most favorable to the non-moving party. *See Matsushita*, 475 U.S. at 587.

Additionally, the Court notes that because Silva has appeared *pro se*, his filings will be construed liberally. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam).

### III.

### A.

Silva attacks the validity of the assessments by claiming that the government failed to prove that it mailed him notices of deficiency via certified mail.

"Under the provisions of the Internal Revenue Code, the IRS must mail a notice of deficiency by certified or registered mail before it can make an assessment for delinquent taxes, which in turn is a prerequisite to seizing and selling the taxpayer's property." *Wiley v. United States*, 20 F.3d 222, 224 (6th Cir. 1994) (citations omitted); *see also* 26 U.S.C. §§ 6212(a), 6213(a). "This notice of deficiency is often referred to as the 'ninety day letter' because after mailing this notice, the IRS must give the taxpayer ninety days to petition the Tax Court for a redetermination of the deficiency before making an assessment." *Id.* at 223 (citing § 6213(a)).

5

"[W]hen the IRS (a) shows that the notice of deficiency existed and (b) produces a properly completed Postal Form 3877 certified mail log (or equivalent), it is entitled to a presumption of mailing, such that the burden of going forward shifts back to the taxpayer." *O'Rourke v. United States*, 587 F.3d 537, 540 (2d Cir. 2009) (per curiam). Here, the parties do not dispute the existence of the deficiency notices, but the government has not produced a Form 3877 or equivalent, so no presumption of mailing applies.

But even without a Form 3877, the government can prove that it mailed a deficiency notice with evidence that is "otherwise sufficient." *Id.* (citations omitted). Some recent unpublished Sixth Circuit cases illustrate what is "otherwise sufficient."[1] For instance, in *United States v. Rohner*, 634 F. App'x 495, 501 (6th Cir. 2015), like here, the government provided copies of the notices but did not produce a completed Postal Service Form 3877. The Court affirmed summary judgment in the government's favor because "each Form 4340 stated that additional tax had been assessed 'per default of 90 day letter' and the taxpayer had provided no 'affirmative evidence that the notices were not mailed.'" *Id.* at 502. Similarly, in *United States v. Shelly*, 482 F. App'x 152, 155 (6th Cir. 2012), the Court affirmed summary judgment in the government's favor where "[t]he government provided copies of the . . . notices of deficiency, which contain the notation 'certified mail,' . . . and certificates of assessment indicating that the [taxpayers] defaulted on their 90–day notices of deficiency" and the taxpayers provided no evidence to the contrary.

Here, the government has provided "otherwise sufficient" evidence that it mailed the deficiency notices. Similar to the notices in *Shelly*, the faces of the notices here suggest they

---

[1] "Unpublished decisions in the Sixth Circuit are, of course, not binding precedent on subsequent panels, but their reasoning may be instructive or helpful." *Crump v. Lafler*, 657 F.3d 393, 405 (6th Cir. 2011) (internal quotation marks and citation omitted). Thus, Silva's attempts to rebuke the government for relying on unpublished Sixth Circuit authority are misplaced.

were mailed via certified mail—the 2001 notice has a 20-digit certified mailing tracking number, and the notice covering 2002 and 2004 indicates "certified mail." (R. 11, PID 73, 92.) Additionally, exactly as the Forms 4340 in *Shelly* and *Rohner*, each Form 4340 here includes an entry stating, "Additional Tax Assessed By Examination Audit Deficiency Per Default of 90 Day Letter[.]" (R. 13-1, PID 124; R. 13-2, PID 131; R. 13-3, PID 137.) And those entries are 90 days or more after the dates on the relevant notices.

Now the question becomes whether Silva has come forward with evidence sufficient to create a genuine issue of material fact concerning whether the notices were mailed. For instance, in *Wiley v. United States*, 20 F.3d 222, 225–26 (6th Cir. 1994), the Sixth Circuit reversed a district court decision granting summary judgment in the government's favor where the taxpayer produced affirmative evidence suggesting the notices were never mailed. There, the government produced a Form 3877 but not the notices themselves because the taxpayer's file had been destroyed. *Id.* at 225–26. The taxpayer opposed the Form 3877 by submitting an affidavit stating he had not received the deficiency notice. *Id.* at 225. More important, the taxpayer also produced expert testimony that a particular IRS record for the taxpayer's account "was missing the transaction code ('494') that was required by IRS Publication 6209 to record the issuance of a notice of deficiency, and this omission indicated that a notice of deficiency was not sent." *Id.* Thus, the Court held that a genuine issue of material fact on the mailing precluded summary judgment in the government's favor.

Unlike the taxpayer in *Wiley*, Silva has produced no evidence that tends to show that the government failed to mail the deficiency notices. Silva submitted an undated printout from the United States Postal Service's website's tracking feature, showing there are no results for the 20-digit certified mailing tracking number that appears on the face of the 2001 deficiency notice. (R.

7

11, PID 74.) But the government has responded with unrebutted evidence that the USPS keeps records of certified mail for only two years. (*See* R. 13-4, PID 134.) Thus, because Silva has not provided any evidence suggesting that his printout came from within two years of the date on the deficiency notice, this evidence is not probative of whether the 2001 notice was mailed.

As for the other notices, Silva also points to various letters he wrote to the IRS in which he previously took the position that he either did not remember receiving the notices or that he in fact did not receive them. (*See* R. 11, PID 76, 81, 95, 98.) This does not preclude summary judgment for the government. For one, Silva's alleged lack of receipt has somewhat limited relevance: "[t]he only requirement is that the IRS send the notice of deficiency by certified or registered mail to the taxpayer's last known address; actual receipt of the notice is not necessary." *Wiley*, 20 F.3d at 224. Additionally, while Silva has submitted other affidavits in this case, he has submitted no affidavit swearing under penalty of perjury that he did not receive the notices. *See Rohner*, 634 F. App'x 501 (noting, in affirming summary judgment in government's favor, that the taxpayer did not provide an affidavit disputing receipt of notices). The mere hearsay in Silva's letters cannot be used to defeat a summary-judgment motion. *See Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009). Finally, as an overarching point, in a case where the government produces copies of deficiency notices along with other evidence that the notices were mailed, the Court hesitates to enable a taxpayer to create a *genuine* issue of material fact on whether the notices were mailed—and further stall collection efforts—simply by making a bare allegation that he never received them.[2]

---

[2] Silva's reliance on *Adolphson v. Comm'r of Internal Revenue*, 842 F.3d 478, 479 (7th Cir. 2016), is also misplaced, as that case primarily addressed a different notice provision under the tax code.

In sum, the government has provided sufficient evidence demonstrating that it mailed the relevant deficiency notices. This evidence is fatal to Silva's summary-judgment motion and is sufficient for the government to carry its burden on this issue for its own motion.

**B.**

The Court next turns to whether the assessments entitle the government to judgment as a matter of law.

An IRS tax assessment is "an IRS determination that a taxpayer owes the Federal Government a certain amount of unpaid taxes" and "is entitled to a legal presumption of correctness." *United States v. Fior D'Italia, Inc.*, 536 U.S. 238, 242 (2002) (citing cases). But "the government can never rest its case on an assessment that lacks a minimal evidentiary foundation." *United States v. Walton*, 909 F.2d 915, 919 (6th Cir. 1990). When, as here, "a taxpayer must make a 'negative assertion,' i.e., a showing that the taxpayer did not in fact earn income that the IRS claims he earned, '[r]easonable denials of the assessment's validity . . . suffice[] . . . to shift the burden back to the government.'" *United States v. Hammon*, 277 F. App'x 560, 563 (6th Cir. 2008) (alteration in original, citation omitted).

The government has shown that the assessments were based on at least a minimal evidentiary foundation. According to the government, the assessments from 2002 and 2004 were based on information obtained from third parties about Silva's income, including Forms W-2, Forms 1099, and Forms 1098, the latter of which showed that Silva had paid thousands of dollars in mortgage interest in 2002. (R. 22-4, PID 235–36.) Aside from indicating that Silva had taken out a mortgage as early as 1998 and was thus on the hook for payments in 2001 (*see* R. 22-6, PID 285), the government does not say what served as the basis for the 2001 assessment, though

9

the assessment itself indicates that, like for the other years, the government prepared a "substitute for return." (R. 22-4, PID 254.)

The Court is unpersuaded by either of Silva's two grounds for attacking the assessments.

First, Silva claims that the Form 4340 certificates of assessment that the government has attached as exhibits are inadmissible for lack of proper authentication and thus cannot help the government carry its summary-judgment burden. (R. 24, PID 290.) But these documents are self-authenticating and admissible under the public records and business records exceptions to the rule against hearsay. *See United States v. Dickert*, 635 F. App'x 844, 849 (11th Cir. 2016); *see also Hughes v. United States*, 953 F.2d 531, 539 (9th Cir. 1992).

Second, Silva urges that summary judgment in the government's favor is inappropriate because of discrepancies in the amount of his tax liability reflected on certain government documents.

The Court is doubtful that Silva is even entitled to offer any evidence disputing the value of his tax liability. After a party to a civil action invokes his Fifth Amendment privilege against self-incrimination on a particular issue, he generally cannot turn around and introduce other evidence directly related to the scope of the privilege. *See Dunkin' Donuts Inc. v. Taseski*, 47 F. Supp. 2d 867, 872 (E.D. Mich. 1999) (citing cases); *see also Traficant v. C.I.R.*, 884 F.2d 258, 266 (6th Cir. 1989) (affirming Tax Court's use of that principle). This general rule applies at the summary judgment stage. *See Taseski*, 47 F. Supp. 2d at 876 n. 3 (citing cases). At Silva's deposition, he asserted his Fifth Amendment privilege against self-incrimination and refused to answer any questions about his income for the tax-years in question. (*See generally* R. 22-5.) The amounts on the assessments, which Silva now challenges, are derived from Silva's alleged income and thus fall directly within the scope of Silva's asserted Fifth Amendment privilege. So

it is not appropriate for Silva to now attempt to offer evidence disputing those values. Moreover, the Court notes that if this case were to proceed to a bench trial, as trier of fact, the Court would be entitled to draw adverse inferences from Silva's assertion of his Fifth Amendment rights. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *see also Keating v. Office of Thrift Supervision*, 45 F.3d 322, 326 (9th Cir. 1995).

Even if the Court were to accept Silva's evidence on this issue, he offers no reasonable denials of the assessments' validity. Silva merely points out that the balances for his tax liability, and certain dates, differ between the complaint in this case and certain documents the government used to record its tax liens against him. Silva concludes that these discrepancies show that the government's computers are "haywire." (R. 24, PID 293–95.)

For the 2001 tax year, the Complaint indicates that the assessed balance due (excluding statutory additions) was $25,405.74 as of December 21, 2015. (R. 1, PID 2.) But a July 22, 2016 "Notice of Federal Tax Lien" recorded with Wayne County indicates that the unpaid balance of assessment for 2001 was $25,427.74. (R. 24, PID 301.) A "Revocation of Certificate of Release of Federal Tax Lien" dated July 25, 2016 and filed with Wayne County indicates a slightly different unpaid balance, $25,383.74. (R. 24, PID 304.) Another July 2016 "Revocation of Certificate of Release of Federal Tax Lien" filed with Oakland County states that the 2001 unpaid balance of assessment was $31,275.69. (R. 24, PID 305.)

These discrepancies have explanations. The Complaint's value for the 2001 assessment is $22 less than the value reflected on the July 2016 notice of lien because of a $22 fee that was assessed after the Complaint was filed. (*See* R. 22-4, PID 257.) The government also points out that the two revocations from July 2016 reflected different balances because they referred to different notices of lien, which were filed at different times and thus reflected different liabilities.

11

For instance, the revocation of certificate of release reflecting a balance of $31,275.69 refers to an August 15, 2012 Notice of Federal Tax Lien, which indicates that same balance for the 2001 assessment. (R. 25-1, PID 320.) The government further explains that this balance is larger than the balance on the July 22, 2016 Notice of Federal Tax Lien because of an October 2012 payment levy of $5,904.95, which as reflected on the Form 4340 for the 2001 tax year, reduced Silva's liability but was later partially offset by collection costs. (*See* R. 22-4, PID 257.)

Silva's arguments fare no better for the 2002 tax year. For that year, the Complaint indicates that the assessed balance due (excluding statutory additions) was $105,365.43 as of December 21, 2015. (R. 1, PID 2.) But a July 25, 2016 "Revocation of Certificate of Release of Federal Tax Lien" filed with Wayne County says the unpaid balance of the assessment was $105,343.43. (R. 24, PID 303.) The government attributes this to a typo on the revocation, as only two digits are off-mark. (*See* R. 25, PID 315.) The Complaint and revocation also reflect differing dates of assessment: December 25, 2006 in the Complaint and August 16, 2004 in the revocation filing. But the government points out that both of these dates are reflected on the Form 4340 for 2002 as dates that relate to the assessments for that year. (*See* R. 22-2, PID 223.) Silva has no response to these reasonable explanations.

Finally, for the 2004 tax year, the Complaint indicates that the assessed balance due (excluding statutory additions) was $30,578.25 as of December 21, 2015. (R. 1, PID 2.) A July 25, 2016 "Revocation of Certificate of Release of Federal Tax Lien" filed with Wayne County has the same balance. (R. 24, PID 303.) But a notice of that lien dated August 4, 2016 indicates that the amount on the lien was $30,591.25. (R. 24, PID 306.) According to the government, this $13 difference stems from fees and collection costs that accrued after the Complaint was filed. (*See* R. 25, PID 316.) Silva also suggests that all three documents reflect different assessment

12

dates. (R. 24, PID 294.) This is not true. The Complaint and notice of lien both say the date was December 25, 2006. The revocation filing says February 13, 2006, but both dates are consistent with dates related to the assessments for 2004, as reflected in the Form 4340. (*See* 22-3, PID 229.) And in any case, these date discrepancies do nothing to cast doubt on the level of the income the government attributed to Silva.

In short, Silva's attempts to point out minor discrepancies between the assessed amounts indicated in the Complaint and other IRS documents do not help him overcome summary judgment in the government's favor. He has failed to point to evidence reasonably denying the assessments' validity. The government is therefore entitled to judgment as a matter of law for Silva's assessed liability—totaling $161,349.42—and any previously unassessed statutory additions under 26 U.S.C. §§ 6601, 6621, and 6622 that have accrued after the assessments. *See United States v. Sarubin*, 507 F.3d 811, 816 (4th Cir. 2007) ("Although establishing the amount of *tax* liability is a matter of evidence, the amount of *interest* accrued on such tax liability is a matter of law."); *see also United States v. Hammon*, 277 F. App'x 560, 569 (6th Cir. 2008) (same).

## IV.

For the reasons discussed, Defendant Ambawalage Silva's Motion for Summary Judgment (R. 11) is DENIED, and Plaintiff the Unites States of America's Motion for Summary Judgment (R. 22) is GRANTED.

SO ORDERED.

Dated: January 20, 2017

s/Laurie J. Michelson
LAURIE J. MICHELSON
U.S. DISTRICT JUDGE

## CERTIFICATE OF SERVICE

      The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on January 20, 2017.

                                                s/Keisha Jackson
                                                Case Manager